UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 18-6091-GW(SKx) | Date | November 8, 2018 |
| Title | *Pretty in Plastic, Inc. v. Maryellis Bunn, et al.* | | |

Present: The Honorable  GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Brian C. Lynch | Carlo F. Van den Bosch |
| Connor Lynch | Gazal Pour-Moezzi |

**PROCEEDINGS:** DEFENDANTS' MOTION TO DISMISS COMPLAINT [17]

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would grant in part and deny in part Defendants' Motion. The Court would deny the Motion as to the breach of contract claim but would grant as to the remaining claims. Pursuant to Federal Rule of Civil Procedure 15(a)(2), the Court would give leave to amend and as such Plaintiff shall be given until November 29, 2018 to file a First Amended Complaint.

|  | : | 15 |
|---|---|---|
| Initials of Preparer | JG | |

<u>*Pretty in Plastic, Inc. v. Maryellis Bunn et al.*</u>; Case No. 2:18-cv-06091-GW-(SKx)
Tentative Ruling on Motion to Dismiss

### I. Background

Plaintiff Pretty in Plastic, Inc. ("Plaintiff" or "PIP) sues Defendants Maryellis Bunn ("Bunn") and 1AND8, Inc. ("1AND8" and, collectively with PIP, "Defendants") for: (1) Copyright Infringement, 17 U.S.C. §§ 106, *et seq.*; (2) Breach of Contract; (3) Unjust Enrichment; and (4) Unfair Competition, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL claim"). *See generally* Complaint, Docket No. 1. Defendants move to dismiss the complaint in full. *See generally* Motion to Dismiss ("Motion"), Docket No. 17. Plaintiff opposes. *See generally* Opposition to Motion ("Opp'n"), Docket No. 21.

The Complaint alleges the following: PIP was founded by "Julie B." in Los Angeles in 2006. Complaint ¶ 2. Plaintiff is a production and fabrication studio for art installations, pop art projects, fine art fabrication, multiples, and designer toys. *Id.* ¶ 3. PIP employs and collaborates with creatives (presumably artists) to deliver projects to paying clients and customers. *Id.* ¶¶ 3, 5. Julie B., as an artist and founder of PIP, has been featured in LA Weekly, Juxtapoz, Design Bureau, Reading Rainbow, NPR's Morning Edition, and was co-curator for "The Art of Toys" exhibit at the Lancaster Museum of Art and History. *Id.* ¶ 4.

1AND8 owns and operates the "Museum of Ice Cream." *Id.* ¶ 9. Each Museum of Ice Cream location is a "pop-up" business in a repurposed building that features ice cream themed rooms through which groups of customers walk. The rooms feature artistic exhibits and immersive experiences, bright playful colors, and the locations are intended to remind visitors of ice cream and evoke feelings of nostalgia. *Id.* ¶ 10.

In September 2016, 1AND8 contacted PIP about creating a room installation at the Los Angeles Museum of Ice Cream's Spring 2017 exhibition. *Id.* ¶ 11. Bunn personally asked PIP to bid on one item and four rooms, including a "Rainbow Sherbet Room." *Id.* ¶ 12. PIP prepared several proposals, but before sharing them, asked on November 3, 2016 that Defendants sign a Non-Disclosure Agreement ("NDA"), which Bunn signed that day. *Id.* ¶¶ 13-14. Later that day, PIP sent 1AND8 concepts and designs for each of the four rooms. *Id.* ¶ 16. Each design was marked as "property" of PIP which could not be "reproduced without written permission." *Id.* The design for the Rainbow Sherbet Room included a solid-white unicorn with a long gold horn.

1

*Id.* ¶ 17. PIP and 1AND8 never reached an agreement for use of PIP's designs. *Id.* ¶ 18.

Just under a year later, in October 2017, a newsletter for the San Francisco Museum of Ice Cream featured a solid-white unicorn with a long gold horn. *Id.* ¶ 19. PIP contacted Defendants to explain the use of the unicorn. *Id.* ¶ 21. Around that time, in an Instagram post, the Museum of Ice Cream stated:

> When designing MOIC, our Co-Founder, Maryellis Bunn, wanted to create a space that commemorated the city's beautiful message of cohesion and inclusivity. MOIC SF's RAINBOW room, uses the symbolism of unicorns & rainbows as a tribute to San Francisco's history of acceptance.

*Id.* ¶ 24. Bunn also described the Rainbow Sherbet Room at the San Francisco Museum of Ice Cream as her direct response to the "pride" celebration in San Francisco. *Id.* ¶ 26.

The various Museums of Ice Cream have received nationwide attention and Bunn has declared that she expects each location to garner at least $10 million in ticket sales. *Id.* ¶ 30. The unicorn in the San Francisco Rainbow Sherbet Room has been a "HUGE hit" and featured in social and other media. *Id.* ¶¶ 31-32. The unicorn is featured on the Museum of Ice Cream website.

On June 18, 2018, the United States Copyright Office accepted an application for copyright registration for the original work, Pretty in Plastic Rainbow Sherbet Room Design Proposal, and assigned it case number 1-6689555661. *Id.* ¶ 40.

Plaintiff alleges that Defendants' infringement of its copyright has been undertaken knowingly and with intent to financially gain from the protected work. *Id.* ¶ 42. Plaintiff further alleges that Defendants violated the NDA by using Plaintiff's design propose at the San Francisco Museum of Ice Cream. *Id.* ¶ 49. Likewise, Plaintiff asserts that Defendants have been unjustly enriched through their wrongful use of Plaintiff's design proposals. *Id.* ¶ 53. Finally, Plaintiff asserts its UCL claim based on Defendants' unauthorized use of PIP's copyrighted work. *Id.* ¶ 58.

## II.     Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). A court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a Rule 12(b)(6) motion has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).

**III.**   **Discussion**

  A.  Judicial Notice

Defendants seek judicial notice of the Merriam-Webster Dictionary definition of "unicorn" and the "unicorn" entry in the Encyclopedia Britannica. *See generally* Request for Judicial Notice ("RJN"), Docket 18. The Merriam-Webster definition describes unicorns as "usually white." *Id.*, Exhibit A. Plaintiff opposes on the ground that the fact "that unicorns are commonly depicted as white . . . is subject to reasonable dispute." *See* Opp'n at 5-6. Plaintiff's argument misses the mark. The dictionary definition and encyclopedia entry for unicorn are "not subject to reasonable dispute," and courts regularly notice such materials. *See, e.g., Singh v. Ashcroft*, 393 F.3d 903, 905 (9th Cir. 2004) (taking judicial notice of an article in the Encyclopedia Britannica); *Sexy Hair Concepts, LLC v. Conair Corp.*, No. 2:12cv02218-CBM, 2013 WL 12119721, at *3 (C.D. Cal. Feb. 25, 2013) (taking judicial notice of a definition in Merriam-Webster).

3

B. Copyright Infringement

To demonstrate copyright infringement, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Servs. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). "[T]he second element has two distinct components: 'copying' and 'unlawful appropriation.'" *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018).

"When the plaintiff lacks direct evidence of copying, he can attempt to prove it circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Id*.

"Proof of unlawful appropriation—that is, *illicit* copying—is necessary because copyright law does not forbid all copying." *Id.* "[A] defendant incurs no liability if he copies only the 'ideas' or 'concepts' used in the plaintiff's work. To infringe, the defendant must also copy enough of the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.' " *Id.* As the Ninth Circuit recently clarified, the term "substantial similarity" means different things to "copying" and "unlawful appropriation." *Id.* The Ninth Circuit explained:

> To prove copying, the similarities between the two works need not be extensive, and they need not involve protected elements of the plaintiff's work. They just need to be similarities one would not expect to arise if the two works had been created independently. To prove unlawful appropriation, on the other hand, the similarities between the two works must be "substantial" and they must involve protected elements of the plaintiff's work.

*Id.*

To determine whether works are substantially similar for unlawful appropriation, courts employ a two-part test: an intrinsic test and an extrinsic test. *Id.* at 1118. "The intrinsic test is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.' " *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir. 2002) (citing *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.1994)). Because the intrinsic test is a "subjective assessment of the concept and feel of two works," *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990), a determination of two works' intrinsic similarities "must be left to the jury," *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). A court may dismiss a complaint on a 12(b)(6) motion, however, for failing to satisfy the extrinsic test. *See Schkeiban v. Cameron*, No. CV 12-0636-R-(MANx),

2012 WL 5636281 (C.D. Cal. Oct. 4, 2012), *aff'd*, 566 F. App'x 616 (9th Cir. 2014) (dismissing a complaint with prejudice because the plaintiff could not satisfy the extrinsic test).

Citing *Cavalier*, the *Rentmeester* court summarized the extrinsic test as follows:

> The extrinsic test assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression. Before that comparison can be made, the court must "filter out" the unprotectable elements of the plaintiff's work— primarily ideas and concepts, material in the public domain, and *scènes à faire* (stock or standard features that are commonly associated with the treatment of a given subject). The protectable elements that remain are then compared to corresponding elements of the defendant's work to assess similarities in the objective details of the works.

*Rentmeester*, 883 F.3d at 1118 (citations omitted).

Here there is no dispute that Plaintiff owns a valid copyright, or that Defendants had access to Plaintiff's design. Further, the Court thinks it clear that Plaintiff's design is similar enough to Defendants' work for the "copying" prong of the inquiry because "the similarities between the two works need not be extensive, and they need not involve protected elements of the plaintiff's work." *Id.*

The task for the Court, therefore, is to apply the extrinsic test to determine whether the Complaint has stated a copyright infringement claim. In applying the extrinsic test, the Court must first define what exactly the Plaintiff alleges is the copyrighted material. Then the Court must filter out the non-protectable aspects of that material and compare the protectable aspects of Plaintiff's work against the corresponding elements of Defendant's. "The key question always is: Are the works substantially similar beyond the fact that they depict the same idea?" *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 917 (9th Cir. 2010), *as amended on denial of reh'g* (Oct. 21, 2010).

As a threshold matter, the Court believes that the Plaintiff's copyright infringement claim rests on the basis that the unicorn used in the "Rainbow Room" of the San Francisco Museum of Ice Cream is substantially similar to the unicorn in Plaintiff's proposed design for the "Rainbow Sherbet Room." *See* Complaint ¶ 19. In other words, Plaintiff's claim is not based on the "Rainbow Sherbet Room" design proposal *as a whole*. Plaintiff does not seem to contest this framing of the issue. *See* Opp'n 7-12 (comparing the protectable elements of the unicorns alone). Therefore, the Court will analyze whether the unicorns themselves are substantially similar. The

5

Court will compare the following picture from page 3 of Plaintiff's Opp'n:

 



Plaintiff PIP's Design Proposal | Defendants' Rainbow Room

Next, the Court must filter out the protectable elements of Plaintiff's unicorn. Defendants argue that "Plaintiff does not have a monopoly on all depictions of a unicorn," *see* Motion at 9, and that the unicorn's white color and long golden horn are not protectable because unicorns are commonly depicted with those features, *see id.* at 12. Plaintiff responds that Defendants copied "[a]t least twenty distinct protectable elements," including:

> (1) both the unicorn in PIP's design proposal and Defendants' rainbow room are approximately the same angle to the back wall of the room and face stage left;
>
> (2) both unicorns have relatively realistic equine bodies;
>
> (3) both unicorns are standing mid-walking stride with opposite pairs of hooves matching (the hooves on one side are both nearer to the center than the hooves on the other);
>
> (4) both unicorns are depicted with their weight on their front legs;
>
> (5) both unicorns are looking slightly away from the forward front leg;
>
> (6) both unicorns have a relaxed tail hanging from the dock;
>
> (7) both unicorns' ears are up;
>
> (8) both unicorns' manes fall to the same side (the side with the front leg back), and the manes fall close to the neck with no partition (i.e. a portion of the mane does not fall to the opposite side);
>
> (9) both unicorns appear to lack forelocks entirely (the piece of the mane on a horse that falls down the forehead);
>
> (10) both unicorns have a shiny gold horn that spirals the entire length of the horn, with a similar helix angle in both horns;

> (11) both unicorns' horn length is similarly proportioned to the size of each unicorn's neck (and relatively the same length);
>
> (12) both unicorns have a relatively flat back with low withers;
>
> (13) both unicorns have strong chest muscles with flexed biceps and triceps;
>
> (14) both unicorns have strong masseter muscles in the cheek;
>
> (15) both unicorns have a similar shoulder slope (the highest point of the wither to the shoulder point to the elbow point);
>
> (16) both unicorns have a relatively long neck;
>
> (17) both unicorns have a relatively large head;
>
> (18) both unicorns are illuminated from above to cast shadows under the unicorn body;
>
> (19) both unicorns are a semi-gloss white; and
>
> (20) both unicorns have monochromatic bodies (including parts that, if on a horse, would ordinarily have color, such as the hooves, eyes, and nose).

Opp'n at 7-8. In reply, Defendants argue that these are not protectable aspects because they "are inherent to the treatment of unicorns." Reply, Docket No. 22, at 4. The Court is inclined to agree with Defendants and would conclude that Plaintiff has not established any protectable aspects of its unicorn.

"[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). In the context of animal sculptures, this means that a plaintiff may not prevent others from copying aspects of the sculptures resulting from the animal's physiology. *See id.* In *Satava*, for example, the Ninth Circuit held that an artist who produced jellyfish sculptures:

> [M]ay not prevent others from depicting jellyfish with tendril-like tentacles or rounded bells, because many jellyfish possess those body parts. He may not prevent others from depicting jellyfish in bright colors, because many jellyfish are brightly colored. He may not prevent others from depicting jellyfish swimming vertically, because jellyfish swim vertically in nature and often are depicted swimming vertically.

*Id.*

Granted, the Court recognizes that it is a bit strange to talk about the physiology or nature of a mythical creature but thinks that it is on solid ground in stating that a unicorn has the physiology of a horse plus a horn on its forehead. Therefore, Plaintiff cannot prevent Defendants

7

from copying the aspects of its unicorn that stem from a horned-horse's anatomical features. The Court would conclude that this renders unprotectable most of Plaintiff's listed aspects. For example, horses could stand (or be depicted standing), mid-stride, with weight on their front legs. *See Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 775 (9th Cir. 2018) (explaining that a pose of two dolphins crossing is not protectable because dolphins can cross in nature). A horse walking or standing mid-stride is "an idea expressed in nature," rendering it unprotectable. *Id.* Further, Plaintiff cannot rely on any aspect of its unicorn's physiology as protectable because many horses have long necks, large heads, strong cheek or chest muscles, flat backs, or manes that lay to one side. *See Satava*, 323 F.3d at 810.[1]

In the Court's opinion, the only aspects of Plaintiff's unicorn that arguably do not flow from a horned-horse's physiology are its monochromatic white body and the specific qualities of the horn. To determine whether these are protectable assets the Court must consider whether they are "standard, stock, or common" to depictions of unicorns. *Id.*

Plaintiff argues that other cases have held similar elements to be protectable. For example, in *Aurora World, Inc. v. Ty Inc.*, a district court noted that the "fanciful" color of a stuffed animal – seemingly meaning a color different from how the animal would be found in nature – may be protectable. 719 F. Supp. 2d 1115, 1136 (C.D. Cal. 2009); *see also Aurora World, Inc. v. Ty Inc.*, Case No. 09-cv- 08463, 2011 WL 13176413, at *18 (C.D. Cal. Mar. 14, 2011) (noting that coloration of stuffed animals can be a protectable element). Next, Plaintiff directs the Court to *Lisa Frank, Inc. v. Orb Factory Ltd.*, CV-15-433-TUC, 2017 WL 6000477 (D. Ariz. Sept. 21, 2017), which found that there was a triable issue on the substantial similarity between two school folders that both depicted a white unicorn, lifting its front leg, looking over its shoulder, and set underneath a rainbow. *See id.* at *10-11; *see also* Opp'n at 9 (for both images). The court did not separate out the protectable from unprotectable elements of the unicorn drawings or even really explain its analysis. *Lisa Frank, Inc.*, 2017 WL 6000477, at *8-10.

*Aurora World, Inc.* and *Lisa Frank, Inc.* only get Plaintiff so far though. While the Court does not doubt that coloration can be protectable in certain situations, like in *Aurora World, Inc.*, that does not answer the instant question. The pinkness of a panda portrayal might be protectable; the pinkness of a pig not so much. Therefore, the Court must examine the originality of depicting

---

[1] Plaintiff has not argued that the *combination* of the otherwise unprotectable elements may qualify for protection. *See Satava*, 323 F.3d at 811.

a unicorn as white with a golden horn. Likewise, the Court agrees that a drawing of a unicorn can be so original as to garner copyright protection, like in *Lisa Frank, Inc.*, but it still must examine Plaintiff's unicorn to determine whether it rises to that level.

In answering these questions, the Court asks whether the Plaintiff's color scheme of monochromatic white body and gold horn is protectable. First, the Court does not think the whiteness of the unicorn is protectable. Depicting a unicorn as white seems the "standard, stock, or common" approach to unicorns. Even setting aside the dictionary definition of unicorns as "usually white," the Court thinks that when most people picture unicorns they envision an ethereal white animal. *See* RJN, Exhibit A, Docket No. 18-1; *see also* Opp'n at 9 (depictions of unicorns in *Lisa Frank, Inc.* show the creatures with white bodies). True, not all depictions of unicorns need be white, but a white unicorn is a common enough trope that the Court would not find that aspect of Plaintiff's work to be protectable.[2] Likewise, a golden horn might not be as common an image as a white body, but the Court thinks that it is a pretty standard feature of depictions of unicorns and would not find it protectable. In essence, the Court thinks Plaintiff is trying to protect the "idea of producing a [gold and white unicorn and the] elements of expression that naturally follow from" that idea." *See Satava*, 323 F.3d at 810.

Even if the Court were to conclude that the above-listed aspects of Plaintiff's unicorn were protectable, it still notes that there are many differences between the beasts. Plaintiff's unicorn is shorter and squatter than Defendants' thin, long-legged version. Defendants' unicorn has a short tail and its hooves are bigger. Also, it's ears are more upright, and its neck is raised so that it is less parallel to the ground than Plaintiff's creature. Importantly, the horns themselves seem different to the Court both in terms of their length and angle. In effect, the Court sees the unicorns as pretty different but for the color of the body and the horn.

As such, the Court would dismiss Plaintiff's copyright claim for failure to demonstrate infringement of protectable aspects of its work.

C. Breach of Contract

Plaintiff alleges that Defendants breached the NDA by not "maintain[ing the] confidentiality of design proposals" provided to Defendants and by "using the design[] proposals" at the San Francisco Museum of Ice Cream. *See* Complaint ¶¶ 47, 49. Defendants argue that the

---

[2] The Court would not be persuaded by the monochromatic aspect either. Without more, the Court does not think that an animal sculpture that is all one color is protectable – it seems like the glass-in-glass technique in *Satava*.

9

breach claim should be dismissed because the NDA only protects Plaintiff's "Confidential Information," and Defendants did not disclose any. *See* Motion at 21-22. Specifically, for the purposes of the NDA, "Confidential Information shall not include information which (a) was or becomes generally available to the public . . . ." *See* Declaration of Gazal Pour-Moezzi ISO Motion, Exhibit B ("NDA"), Docket No. 17-4, at 2. And that, because "Plaintiff does not have a monopoly on all depictions of a white unicorn," the Defendants' unicorn was not a disclosure of "Confidential Information." Motion at 22.

Plaintiff responds that even if the unicorn were not entitled to copyright protection, its disclosure could still constitute a breach of the NDA. *See* Opp'n at 13 ("[E]ven if instead of a detailed design proposal, Plaintiffs had provided just a short, simple email that said, 'We propose a unicorn in the rainbow room for the Museum of Ice Cream,' that would still qualify as Confidential Information under the NDA subject to nondisclosure under the facts alleged in the Complaint."). Defendants respond that pursuant to the NDA they could not have used (and did not use) Plaintiffs' design proposal as a whole. Reply at 9.

The Court does not think that protections under copyright law and the definition of "Confidential Information" under the NDA are coextensive, such that the Court's tentative ruling on the copyright claim dictates its ruling on this breach of contract claim. In other words, the Court can imagine an example where a piece of work is not subject to protection under copyright law but would be considered "Confidential Information."

The NDA defines "Confidential Information" as:

> [A]ny information disclosed by or on behalf of the Disclosing Party to the Recipient at any time before or after the execution of this Agreement relating to the Subject Matter described above, including, without limiting the generality of the foregoing, any drawings, notes, data, reports, photographs, audio and/or video equipment, models, samples and the like and any copies or reproductions thereof.

NDA at 1. The "Subject Matter described above" is:

> Any Confidential or proprietary information of the Disclosing Party or its clients including but not limited to technical and financial information, proprietary data, know-how, designs, specifications, drawings, applications, manufacturing materials and methods regarding the Disclosing Party's or its clients' plans, programs, processes, products, costs, equipment, operations, clients or customers.

*Id.*

At this stage in proceedings, the Court is inclined to read the definition of "Confidential Information" broadly, such that "any information disclosed by" Plaintiff could include the *idea* or *concept* of placing a white unicorn in a rainbow-themed room. *Cf. Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 981 (9th Cir. 2011). Further, the Court does not think that the idea of a white unicorn in a rainbow-themed room was "generally available to the public" and thereby excluded from the definition of "Confidential Information."

As such, the Court is inclined to deny the Motion as it pertains to the breach of contract claim.[3]

### D. Unjust Enrichment and UCL Claim

Defendants address these causes of action together and the Court will do the same. Defendants argue that the Copyright Act preempts Plaintiff's Unjust Enrichment and UCL Claims because: (1) Plaintiff's work falls within the subject matter of the Copyright Act, and (2) the rights asserted in these claims are "equivalent to" those protected in the Copyright Act. Motion at 18 (citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001)). Material does not necessarily need to be protected under the Copyright Act to fall within its subject matter. *See Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1124 (N.D. Cal. 2001). As to the second prong, "a right which is the 'equivalent to copyright' is one that is infringed by the mere act of reproduction." *Laws v. Sony Music Entm't*, 448 F.3d 1134, 1144 (9th Cir. 2006). It is not enough that the state law claim has an additional element, that additional element "must transform the nature of the action." *Id.*

Plaintiff only argues that its "state-law claims are grounded in the [tort of] breach of the confidential relationship between the Parties." Opp'n at 12-13. Plaintiff continues that the Copyright Act does not preempt this tort. Defendants argue that Plaintiff has not pleaded a "confidential relationship" because the parties had an "arm-length transactional relationship, not a fiduciary one."

The Court is inclined to agree with Defendants. Although the parties entered into the NDA, the Court does not believe that that connection alone is sufficient to establish a "confidential relationship" akin to a fiduciary relationship. *See* 4 Nimmer on Copyright § 19D.02[A][2][a]

---

[3] The Court notes that it would not be inclined to retain jurisdiction of this case if the copyright claim is ultimately dismissed.

("The essence of a confidential relationship between a plaintiff and a defendant is an acceptance by defendant of plaintiff's trust. When [] such a relationship exists, the law imposes duties on defendant in the nature of a fiduciary." (internal quotation marks and alterations omitted)); *id.* at § 19D.05[B][2] (citing *Davies v. Krasna*, 14 Cal. 3d 502 (1975), and explaining that handing over information in confidence does not create a "confidential relationship."). As such, the Court would grant the Motion as to Plaintiff's Unjust Enrichment and UCL Claims.

### E.  Bunn in her Individual Capacity

Defendants argue that the Court should dismiss the claims against Bunn in her personal capacity. Motion at 23.

As to the breach of contract claim, Defendants argue that Bunn signed the NDA on behalf of 1AND8 and that directors and officers are not personally liable on contracts they sign unless they expressly agree to bind themselves. *Id.* Plaintiff responds that it alleged that both 1AND8 and Bunn were bound by the contract and that Bunn signed the NDA. *See* Opp'n at 14. Further, Plaintiff argues that the NDA binds the "recipient," which here is designated as "vendor." *See* NDA at 1. Bunn signed under "recipient." *Id.* at 3. There is no mention of 1AND8 in the NDA.

On these alleged facts, the Court would deny Defendants' Motion to dismiss Bunn in her individual capacity from the breach of contract claim.

Even though the Court would grant Defendants' motion as to all Defendants on the remaining claims, the Court notes that it would conclude that Bunn should not be dismissed on the separate basis that she was not acting in her individual capacity. Plaintiff alleges that Bunn personally viewed Plaintiff's design proposals and then claimed that the San Francisco Rainbow Room was "[her] reaction to what's going on." The Court thinks this is enough to plead that Bunn directed the infringement or was the "guiding spirit" or "central figure." *See Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1115 (C.D. Cal. 2010)

### IV.  Conclusion

For the foregoing reasons, the Court would grant in part and deny in part Defendants' Motion. The Court would deny the Motion as to the breach of contract claim but would grant as to the remaining claims. Pursuant to Federal Rule of Civil Procedure 15(a)(2), the Court would give leave to amend and as such Plaintiff shall be given until November 29, 2018 to file a First Amended Complaint.